559 P.2d 183

**Joe D. HAWTHORNE, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Coulter Cadillac, Respondent Employer,**

**Mission Insurance Company, Respondent Carrier.**

**No. 1 CA–IC 1426.**

Court of Appeals of Arizona, Division 1, Department C.

Nov. 16, 1976.

Rehearing Denied Dec. 29, 1976.

Petition for Review Denied Jan. 25, 1977.

**64**

Machmer, Schlosser & Meitz, Ltd., by Ronald M. Meitz, Phoenix, for petitioner.

John H. Budd, Jr., Chief Counsel, The Industrial Commission of Ariz., Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P. C., by Donald L. Cross, Phoenix, for respondent Carrier.

## OPINION

JACOBSON, Acting Presiding Judge.

This review by writ of certiorari of an Industrial Commission's hearing officer's decision places in issue the sufficiency of the evidence supporting the decision that petitioner suffered no permanent disability as a result of his previous industrial injuries.

The procedural posture of this case is somewhat complicated. On March 14, 1974, petitioner, Joe D. Hawthorne, sustained an injury to his low back arising out of his employment. This claim was accepted and compensation benefits were paid by the respondent carrier. By Notice of Claim Status, this claim was closed and he was discharged from treatment without residual disability, effective May 10, 1974. No timely Request for Hearing was made as to this notice.

On August 10, 1974, Hawthorne suffered a second industrial injury to his low back. Following this second injury, he filed both a claim for the August 10, 1974 injury and a Petition to Reopen the claim filed in connection with the March 14, 1974 injury. The carrier accepted the claim filed on the August 10, 1974 injury but by Notice of Claim Status denied the reopening of the March 14, 1974 injury. The denial of the reopening was the subject of a timely Request for Hearing. Hawthorne has not returned to work following the second injury.

In the meantime, a Notice of Claim Status relating to the August 10, 1974 injury was issued, placing Hawthorne on light work status. Because Hawthorne continued to have complaints, he was seen on March 27, 1975 by a group consultation consisting of Drs. Aidem, Yadon and Edwards.

The pertinent portion of the group consultation report is:

"His [Hawthorne's] findings do not in any way suggest the possibility of nerve root compression or irritation of disc protrusion. He does have degenerative disc disease and degenerative joint disease consistent with his age and stature.

"The consultants are of the opinion that the patient's condition with reference to the injury of August 10, 1974, is medically stationary and that he does not require further medical treatment or observation. He does not require a myelogram, and there is no indication for surgery . . . . The patient has no permanent functional impairment relating to the accident in question . . . ."

Based upon this report, the carrier issued a Notice of Claim Status, effective as of March 27, 1975, terminating benefits and discharging Hawthorne without residual disability attributable to the August 10, 1974 injury. This notice was the subject of a timely Request for Hearing.

Subsequent to the termination of benefits, Hawthorne was hospitalized on May 5, 1975 by Dr. Willard Hunter, who performed a myelogram and diagnosed a herniated or ruptured disc and subsequently performed a procedure known as chemonucleolysis (a non-surgical procedure). All the medical

experts agree that on May 5, 1975, Hawthorne was suffering from a herniated or ruptured disc, and that he had degenerative disc disease.

Hearings were held on Hawthorne's various Requests for Hearing in June, July and August of 1975. On September 23, 1975, the hearing officer issued his decision which denied Hawthorne's Petition to Reopen the claim for the March 14, 1974 injury and found with respect to the August 10, 1974 injury that Hawthorne had not sustained any further disability; that his condition was medically stationary as of March 27, 1975; and that he was entitled to no further compensation. Following post-decision procedures, Hawthorne has sought review in this court by way of writ of certiorari.

In arguing that the evidence does not support the hearing officer's decision, Hawthorne relies primarily on this court's decision in *Garcia v. Industrial Commission*, 26 Ariz.App. 313, 548 P.2d 26 (1976). In *Garcia*, the same factual sequence of events was present as is present here, that is, injury to the back, group consultation finding no impairment due to the injury, and subsequent surgery revealing a herniated disc which treating physicians relate to the original injury. The *Garcia* court indicated that under these circumstances the hearing officer's decision which found non-compensability could only be supported on two theories: (1) that a herniated disc was not present or (2) that the disc was present and that it occurred after the group consultation and was not related to the industrial injury.

The court in *Garcia* then noted that there was no direct evidence which would support the second theory, although it could be inferentially supported, but more importantly, the hearing officer made no finding on this crucial issue. Based upon the court's inability to determine whether the hearing officer's decision was legally sound, the decision was set aside.

*Garcia* is distinguishable from this case, in that here the hearing officer's decision clearly finds that the herniated disc diagnosed by Dr. Hunter was not related to the industrial episode. After reciting the existence of the herniated disc and Dr. Hunter's relating that disc to the two prior industrial injuries, the decision further states: "Both Doctors Yadon and Aidem were of the opinion the herniated disc was not related to the industrial episode." The decision then recites the duty of the Commission to resolve conflicts in the medical evidence and holds that Hawthorne has not sustained his burden of proof. In our opinion, this is a sufficient showing that the hearing officer, in fact, appreciated the significance of the factual sequence of events and considered and resolved the medical evidence on this point. In this regard, this case does not suffer from the deficiency noted in *Garcia*.

It then becomes necessary for us to determine whether the hearing officer's determination that Hawthorne's present herniated disc is not causally related to either industrial injury is supported by the evidence. First, we note that Dr. Joseph R. Gottesman, who was Hawthorne's attending physician following the August 10, 1974, injury, examined Hawthorne in November, 1974, and performed the diagnostic procedure of an electromyogram. As a result of that examination, he testified:

"Q: If you are going to have an episode of trauma occurring in March of '74 and again in Aug. of '75 [sic]; if that trauma were to produce herniation or protrusion of intravertebral disc, is the period of August of '74 until November of '74 sufficient period of time for it to show up on the EMG [electromyogram]?

"A: Absolutely. You can see changes within a two-week period of time.

"Q: Do I understand that you believe Mr. Hawthorne's condition over this period of five months or so was gradually improving?

"A: That's correct."

We also note that Dr. Hunter, who testified to the relationship of the herniated disc to the prior injuries of March and August of 1974 when asked on cross-examination as to the effect of the group examination conducted in March, 1975, testified:

"Q: Would it be reasonable in your experience that a disc which produces that kind of image on a myelogram should certainly produce significant symptoms and pathology on examination when the exam is appropriately performed by competent examiners?

"A: It should."

Also, Dr. Yadon, one of the group consultants who examined Hawthorne in March of 1975, testified:

"Q: The question simply is: Based upon those facts, your group consultation report, and your reading of these X-rays and myelographic reports and diskograms [sic] today [which revealed the herniated disc], whether or not you think one or both of the injuries contributed to the disc problem that you said appeared on these X-rays?

\*    \*    \*    \*    \*    \*

"A: I don't think I can answer that categorically. The myelographic findings are not consistent with the physical examination we performed in March, 1975. The physical exam at that time, after the injury of March, 1974, and August, 1974, was long enough after the events that there should have been some objective evidence of nerve root pressure at that time, and we didn't find any. So, all I can say in answer to your question is I cannot definitely correlate the two, because the physical examination did not suggest this type of lesion."

Finally, there was evidence from a surveillance witness who observed Hawthorne after the March, 1975, examination and prior to the discovery of the herniation, perform physical activities which were inconsistent with the presence of a herniated disc.

As previously noted, Hawthorne suffered from a degenerative disc disease. The Commission has the duty to resolve conflicts in the medical testimony. *Malinski v. Industrial Commission*, 103 Ariz. 213, 439 P.2d 485 (1968). We find that there was reasonable evidence to support both the existence of a medical conflict as to the causation of Hawthorne's herniated disc condi-

tion and the hearing officer's decision that his present condition is unrelated to his prior industrial injuries.

The decision of the hearing officer is affirmed.

HAIRE, Chief Judge, Division 1, and SCHROEDER, J., concur.